## Louisville & N. R. Co. v. Brock's Adm'r.

Jan. 12, 1940.

H. T. Lively, J. Miller White, J. C. Baker and H. L. Bryant for appellant.

R. L. Pope, George R. Pope and R. S. Rose for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

Between five and six o'clock P. M. on February 26, 1938, Charles Brock, a lad between fifteen and sixteen years of age, was fatally injured by a train collision on the northbound railroad track of the defendant and appellant, Louisville & Nashville Railroad Company, just beyond the northern corporate limits of the town of Wallins in Harlan county. The later appointed administrator filed this action in the Harlan circuit court against defendant to recover damages sustained by the estate of the decedent on account of the latter's death, charging in his petition that the place where decedent was injured was one where the law imposed the duty on the part of the operators of trains to be on the lookout ahead and to give warnings of the approach of the train thereto, because of the fact that it had been used by a sufficient number of the public as a pedestrian walkway for the length of time to create such obligations on the part of the defendant by way of anticipating the presence of persons at that place and that the operators of the train colliding with decedent had negligently failed to observe such requirements which were the proximate cause of the fatal collision. The answer denied the grounds relied on for recovery, with an additional affirmative defense of contributory negligence, the latter of which was denied, thus forming the issues. Upon the trial—at which extensive evidence was taken and heard—the jury under the instructions of the court returned a verdict in favor of plaintiff for the sum of $4,000 which the court declined to set aside on the defendant's motion for a new trial, and, from the judgment pronounced on that verdict, it prosecutes this appeal.

The motion for a new trial contained eight separate distinct grounds as constituting reversible errors, three of which were and are (a) refusal of the court to sustain defendant's motion for a directed verdict in its behalf, made at the close of plaintiff's testimony as well as at the close of all the testimony; (b) the verdict is not sustained by sufficient evidence and is flagrantly against it; and (c) erroneous instructions (all of which

were given upon motion of plaintiff) and the refusal of the court to give offered instructions by defendant after its motion for a peremptory instruction was overruled. The other five grounds embodied in the motions for a new trial are of but little material value since they relate largely to the admission and rejection of testimony of doubtful relevancy, and of equal doubtful weight, and for which reasons we will devote no part of this opinion to a consideration of any of the grounds except those alphabetically listed, supra.

Grounds (a) and (b) relate exclusively to the probative value of the testimony heard at the trial, and they will be considered and determined together, and which require a reference to the testimony directed exclusively to the way, manner, conditions and circumstances existing, and under which the collision occurred, which are necessarily relevant in determining the legal rights of the parties. The great bulk of the testimony was directed to a description of the premises at the point of the accident; i. e., the tracks of defendant, the pathway leading down Laurel branch onto the defendant's right of way at the fatal point; the changing of the road formerly running down Laurel branch many years ago by the defendant when it built its railroad track across Laurel branch where it constructed a culvert through which it turned the road, thereby making an underpass instead of a grade crossing, and which was followed by pedestrians largely continuing to use and appropriate the abandoned portion of the road for some short distance away from the west side of the railroad track and to travel the right of way after getting upon it in going south to the town of Wallins. In some instances, such pedestrian travelers, according to the proof, would cross the track and finally reach the road passing through the culvert after it passed east under the railroad track, and which road then ran between the railroad track and Cumberland River into which Laurel branch emptied some short distance from the railroad. The testimony was also directed to the number of pedestrians who entered upon the railroad right of way and who so traveled it to the old abandoned bank road running up Laurel branch, both in going to or from the right of way. The testimony also described not only the surrounding topography of the immediate adjacent area, but likewise the location of the town of Wallins with reference to the point of the fatal accident, and

the railroad tracks, which included a house track running from some point near the depot, located 600 feet from the point of the accident and connecting with the northbound main line of defendant's track at a point some 50 or more feet from where the accident occurred. That house track—which the proof shows was occupied by seven or eight stationary freight cars on the fatal occasion—is entirely east of the two main tracks of defendant and, under the proof, those cars could not and did not obstruct in any manner the ascertainment of an approaching train by one located on the right of way, whether between tracks or upon them, notwithstanding the vehement insistence of counsel for plaintiff to the contrary. Such insistence is sought to be supported by the fact that the main tracks of defendant at the point of the accident—and extending south almost to the depot—is on a slight curve, but neither map (one furnished by plaintiff and one by defendant) shows such a curvature as to make the standing cars an obstruction to either sound from or sight of a train approaching from the south as was the fatal one on this occasion.

The parties were not limited in the number of witnesses they introduced in the portraying of the situation with reference to the matters referred to. Consequently, the testimony of many witnesses was practically a repetition of what others had given, and, in many instances, upon issues about which there was no dispute. Plaintiff's witnesses varied in their estimate of the number of people who traveled as pedestrians the track of defendant at the point of the accident, in either crossing it at that point or traveling upon it longitudinally in going to and from the town of Wallins. Some of the witnesses previously established themselves at the point where the old road, supra, entered upon the right of way of defendant, at which point it had left a gap through its fence enclosing its right of way at that point. They professed to have counted within a given time the number of pedestrians passing through the gap in the fence, in traveling both directions, which, according to their count, was from 150 to 250 each 24 hours. However, they stated that some of the persons whom they thus counted traveled the tracks—or the space between tracks—whilst others traveled a path running shortly from the ends of the ties of the western track of defendant and between it and a bluff on the west side of the track; whilst still others would neither cross the

tracks nor travel south toward Wallins, but traveled north on the same western path leading to places in that direction. No one professed to count the number of people who got upon the track or spaces between the tracks or who crossed after they got upon them, and for which reason it is extremely doubtful if plaintiff's testimony was sufficient to show that the tracks at the point of the accident was then or had been used by a sufficient number of pedestrians for a sufficient length of time to create the obligations, supra, on the part of the defendant, so as to charge it with negligence for their non-observance. But, however that might be, and admitting arguendo that the proof thoroughly established the conditions and circumstances creating such obligations on the part of the defendant and its failure to observe them, there yet remains the facts uncontradictorily proven by the eyewitnesses to the accident as to how and in what manner it occurred so as to show whether or not the deceased was guilty of such contributory negligence as to defeat the right of recovery by his administrator. Before calling attention to that testimony, it, perhaps, should be said that a small percentage of the more or less numerous witnesses testifying upon the point stated that no whistle nor ringing of the bell was made as the train approached the alleged pedestrian passway across the tracks at the fatal point, but the great preponderance of the testimony is that the bell was ringing at the time and that whistle signals were made for a crossing just south of the depot and at different points between that crossing and the depot in calling for and answering signals of the depot agent with reference to orders, if any, for that train, and which the great majority of the witnesses distinctly heard, but, whether decedent heard them, is, of course, a fact unknown. They however were given within a space between some 2,000 and 800 feet south of the point of the accident.

But after all, the giving of both character of signals as the train approached the place of the accident has no other relevancy except to notify decedent and other travelers on or across the track of the approach of the train, and if its approach, as established by the only eyewitness to the accident, was in such manner as to unerringly establish the fact that decedent was bound to know of its approach when he entered upon the track, the failure to give signals would thereby become wholly immaterial, since their purpose would be fulfilled by

actual observance. If, therefore, the only testimony introduced on the point inevitably shows that the deceased went upon the track practically immediately in front of the train when it was so near to him as to render it impossible for its operators to prevent the collision, and when he was bound to know of the proximity of the train, then such contributory negligence on his part would—under all of the declared law by this and other courts—defeat the right of recovery. It, therefore, becomes essentially important to consider the testimony upon that crucial and determinative issue.

Strange to say that, notwithstanding the great multiplicity of witnesses who testified in the case for the one side or the other, only four of them were actually or practically eye-witnesses to the collision; one of whom was a brother of the deceased, 28 years of age, and a Mr. Goins, who was with the brother, both of whom were traveling north on the railroad right of way (the exact portion of which is not shown) and had reached the point of the accident when it occurred. The other two were companions of the deceased who had approached the right of way in the path leading down Laurel branch and who, with him, had entered upon the right of way through the gap in defendant's fence enclosing its right of way. Decedent's brother testified that at the time of the collision he was somewhere on the west side of defendant's right of way opposite the eastern and northbound track of defendant, upon which the train was traveling, and about 20 feet from it as well as that same distance from his brother. He testified that he saw his brother enter upon the track when the train was approaching with the headlight shining not more than 25 feet from the point of collision, which, of course, occurred almost instantly after deceased entered upon the track. The witness Goins, who was with decedent's brother at the time, substantially corroborated that testimony. But, in addition thereto, the latter witness was asked and answered these questions:

"Q. From the time he crossed over there and got up on the track that the train was on, tell the jury what he did and how quick that happened. A. Well, all I know about it he walked on up to the track and went a step or two, a few steps up the track, I couldn't say how many steps, and he looked up and the train was about ten feet from him, I guess, in front of him, and he looked up and saw the train and he made a jump.

"Q. And it hit him before he could jump off the track? A. Yes sir.

"Q. And the train was so close he couldn't jump off the track in time to keep the train from hitting him? In 'time to keep from being hit? A. That is right."

Those two witnesses were introduced by plaintiff, whilst defendant introduced Gobie York, 15 years old, and his brother, John B. York, 12 years of age, companion travelers of deceased that evening, and they substantiated the facts with reference to how the accident happened, the proximity of the train at the time the decedent entered upon the track, and other material facts as was done by plaintiff's witnesses to whom we have above referred. The York brothers stated that they, with another brother, were traveling the approaching path to defendant's right of way down Laurel branch under an umbrella (a slight snow was falling) with deceased along with them, but he was not under the umbrella; that before they got upon the right of way they had already discovered the approach of the train, not only from the whistle but from hearing it and also seeing it, and that decedent started across the tracks diagonally toward the approaching train. when this occurred:

"Q. Did you say anything to Charles that night there when he started across the track? A. Yes, sir.

"Q. Tell what you said to him? What did you say to Charles there when he started across the tracks? A. I hollered and told him to come back, there was a train coming.

"Q. Did he come back? A. No. sir.

"Q. What did you and the other boys do then? A. We stood there at the gate and waited on our mother.

"Q. Did any of the other boys get up on the track except Charles? A. No sir."

Witness stated that he, of course, could not tell whether deceased heard his warning or not, but the situation described by him did not reveal any reason why the warning could not be or was not heard.

However, that witness (Gobie York), together with the others referred to, described a situation immediately preceding the collision which demonstrated, according

to all.the rules of human experience, that it was apparently impossible for decedent not to have known that the train was approaching toward him and was but a short distance from him, and which fact alone was a sufficient warning and called for the exercise of care on his part for his own protection and admonished him to not enter upon the track. No one denied the testimony of the witness Goins, who stated that when decedent entered upon the track he made a few steps up the track which was in the direction from which the train was approaching. That testimony is contradicted by no one, and the four witnesses to whom we have referred are the only ones who professed to describe what happened at the immediate time, and their testimony is not contradicted by any other witness or by any circumstance.

Attorneys for appellant cite a great number of cases from this court wherein it was held by us, under the facts developed therein, that because of some proven fact—or for which there was sufficient testimony to authorize its finding—the railroad company failed to perform some duty it owed to the decedent and which was the proximate cause of the injury complained of. On the other hand, counsel for defendant cite many cases where the railroad company was under obligations to take certain steps or perform certain acts looking to the protection of travelers upon or across its tracks in order to warn them of the approach of its trains; but where the injured person—whether resulting in death or not—was himself guilty of such contributory negligence proximately producing his injury as to defeat a cause of action therefor, under the general doctrine of contributory negligence in such cases. Among these cases so holding are Chesapeake & Ohio Railway Company v. McMath's Adm'r, 198 Ky. 390, 248 S. W. 1051; Louisville & Nashville Railroad Company v. Sizemore's Adm'r, 221 Ky. 701, 299 S. W. 573; Chesapeake & Ohio Railway Company v. Conley's Adm'x, 261 Ky. 669, 88 S. W. (2d) 683; Louisville & Nashville Railroad Company v. Welsh, 272 Ky. 120, 113 S. W. (2d) 879; Chesapeake & Ohio Railway Company v. Bryant's Adm'r, 272 Ky. 339, 114 S. W. (2d) 89; Martin v. Chesapeake & Ohio Railway Company, 273 Ky. 32, 115 S. W. (2d) 306; Cincinnati, N. O. & T. P. Railway Company v. Wallace's Adm'r, 267 Ky. 661, 103 S. W. (2d) 91, and others cited in those opinions. In the listed Sizemore

case the decedent was traveling on the track approaching the oncoming train from the opposite direction, and that fact alone was held by us to authorize a directed verdict against his administrator in an action to recover damages for his death, whilst in the listed Bryant case there were no eyewitnesses as to how the accident happened, but we concluded that the unerring circumstances clearly established the fact that the decedent knew that the train was approaching when he entered upon defendant's track in front of it, and that with that knowledge he invited the danger which he thereby created and which constituted such contributory negligence on his part as to defeat a recovery. Other cases, with shades of differentiating facts but justifying the same conclusion, will be found dealt with in others of the referred to cases, and still others cited in them. Such declaration of the controlling rule is necessarily based upon the principle that a railroad company, and the operators of other agencies that produce accidents, are not guarantors of safety of those who might come in contact with its operating trains or other facilities, and that human declared law, as well as the law of nature, imposes upon and demands of the individual the exercise of ordinary care for his own safety and to not depend upon others to assume the duties of guardianship over the absolute safety of his person.

But it is argued in this case that there was no proof that the decedent knew of the approach of the train, although he was warned of that fact by the witness Gobie York. However, that fact may be established by circumstances as well as by direct testimony, and the circumstances described by the eyewitnesses to the accident point unerringly to the conclusion that decedent was bound to know of the approach of the train. It had a brilliant headlight upon the front of the engine, at the time he entered upon the defendant's track almost immediately in front of it, and we compliment the decedent—who is shown to have possessed more than average intelligence for one of his age—when we say and hold that it would have been impossible for him to have been so dumb at the time as to not perceive the approach of the. train in the described circumstances. Emphasis is sought to be put upon the fact of the standing cars upon the house track which, it is argued, obstructed his view. But, as we have previously said, it is clearly demonstrated that they had no obstructive ef-

fect on preventing anyone occupying the position of decedent discovering the approach of the train, both through sound and by sight, and the contention so made is entirely unfounded. We, therefore, conclude that the court erred in not sustaining defendant's motion for a directed verdict in its favor.

Complaint is made of the instructions, all of which, as we have said, were given at the behest of plaintiff. We withhold an opinion concerning them, except the one submitting the issue of contributory negligence, which required the jury to find that if it did exist it was the sole cause of the collision, and which was and is clearly erroneous under all opinions that we or other courts have delivered upon the question. However, it might be said that other parts of the instruction might have relieved it of that error, but, whether so or not, the court will not so draft it on another trial, if one should be had.

Wherefore for the reasons stated, the judgment is reversed, with directions to set it aside and to sustain the motion for a new trial, and for other proceedings consistent with this opinion.